# In the United States Court of Federal Claims

No. 20-1903C

(Filed:  August 12, 2022)

|  |  |
|---|---|
| **TEXTRON AVIATION DEFENSE LLC,** | ) |
| *Plaintiff,* | ) |
| **v.** | ) |
| **THE UNITED STATES,** | ) |
| *Defendant.* | ) |

*Thomas A. Lemmer*, Dentons US LLP, Denver, CO, for plaintiff.  With him on the briefs were *Phillip R. Seckman* and *K. Tyler Thomas*.

*Daniel B. Volk*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, *Patricia McCarthy*, Director, and *Elizabeth M. Hosford*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and *Peter M. Casey* and *Debra A. Berg*, Defense Contract Management Agency, Hanscom AFB, MA.

## OPINION AND ORDER

**SOLOMSON**, **Judge.**

This Contract Disputes Act ("CDA") case involves the arcane subject of pension cost allocations — a process of such complexity that, if it were just a game, it would make professional poker look like a round of go fish.[1]  In this case, the stakes are substantial: Plaintiff, Textron Aviation Defense LLC ("Textron AD"), seeks approximately $19.4 million from Defendant, the United States, following Textron AD's

---

[1] *See generally* Steven L. Briggerman, *CAS 413: Determining Segment Closing Adjustments Triggered by Sale of a Segment – Part I*, 24 No. 3 Nash & Cibinic Rep. ¶ 10 (March 2010) (describing CAS 413 as "one of the most complex and difficult regulations in Government contracting").

acquisition of another company reorganized as part of bankruptcy proceedings in late 2012 and early 2013.

Notwithstanding that Textron AD's counsel were dealt some bad cards in this case — Textron AD delayed submitting its required administrative claim until 2020 — they played a solid hand, giving this Court serious pause about whether the government held the winning trump card: an ironclad statute of limitations defense. Ultimately, however, the Court concludes that government was not bluffing: the statute of limitations indeed bars Textron AD's complaint from moving forward.

## I.     LEGAL FRAMEWORK

### A.  The Government Cost Accounting Standards

In 1968, the United States House of Representatives' Banking and Currency Committee held a series of hearings on whether to renew the Defense Production Act of 1950.[2]  Witness testimony, including that of United States Navy Admiral Hyman G. Rickover, identified several problems stemming from the lack of uniform cost accounting standards — ranging from risks that "defense suppliers could make excessive profits and disguise them as overhead costs" to difficulties in "assess[ing] costs incurred on contracts" and in "compar[ing] costs among prospective contractors' cost estimates."[3]  As a result, Congress created the Cost Accounting Standards Board (the "Board") in 1970.[4]

The Board "has exclusive authority to prescribe, amend, and rescind cost accounting standards, and interpretations of the standards, designed to achieve uniformity and consistency in the cost accounting standards governing measurement, assignment, and allocation of costs to contracts with the Federal Government."  41 U.S.C. § 1502(a)(1).  Between 1972 and 1980, the Board issued nineteen Cost Accounting Standards ("CAS") "intended to ensure that incurred costs were appropriately allocated to government contracts."[5]  Today, the CAS are recognized as "accounting principles that regulate how the costs of Government contractors are defined and measured, assigned to cost accounting periods, and allocated to contracts."  2 Karen L. Manos, *Government Contract Costs & Pricing* § 60.1 (June 2021 update).  Federal Acquisition Regulation ("FAR") 52.230-2, a standard contract clause, is incorporated into CAS-

---

[2] U.S. Gov't Accountability Off., GAO-20-266, *Cost Accounting Standards: Board Has Taken Initial Steps to Meet Recent Legislative Requirements* 3 (2020) [hereinafter GAO-20-266].

[3] GAO-20-266 at 3.

[4] GAO-20-266 at 4.

[5] GAO-20-266 at 4.

covered contracts and requires contractors to "[c]omply with all CAS, including any modifications and interpretations[.]"  FAR 52.230-2(a)(3).

### B.  Cost Accounting Standard 413

At issue in this case is CAS 413, "Adjustment and Allocation of Pension Cost." 48 C.F.R. § 9904.413.[6]  Pension plans are deferred-compensation plans maintained by employers that pay benefits to employees after they retire.  48 C.F.R. § 9904.413-30(a)(12).  Because pension plans are inherently future-oriented, companies that provide employees with pensions must determine, in each individual accounting period, how much money to invest in the plans to meet the required future payouts.  *See Gates*, 584 F.3d at 1064.  For federal contractors, these pension plan costs qualify as contract costs that "are paid, in part, by the government."  *Id.*

Determining the proper amount to contribute to pension plans in each period requires contractors to make estimates on "a wide range of variables, such as the expected growth of the pension fund's assets and the length of time before participants retire."  *Raytheon Co. v. United States*, 747 F.3d 1341, 1345–46 (Fed. Cir. 2014).[7]  Congress vested the Board with the power to promulgate cost accounting standards in part to help contractors navigate the complexity of these estimates.  *Allegheny Teledyne*, 316 F.3d at 1370.  In that regard, CAS 412 and 413 specifically provide rules for calculating and allocating pension costs to particular business segments and to individual contracts within segments.  *See Gates*, 584 F.3d at 1064–65 (citing 48 C.F.R. §§ 9904.412-40(d), 9904.413-40(c)).

CAS 412 "establishes the basis on which pension costs shall be assigned to cost accounting periods," 48 C.F.R. § 9904.412-20(a), and "requires contractors to fund pension costs within the cost accounting period in which those costs are assigned," *Raytheon Co.*, 747 F.3d at 1345 (citing 48 C.F.R. § 9904.412-50(d)(1)).  Our appellate court,

---

[6] "The CAS provisions can be found in the Code of Federal Regulations.  CAS xyz corresponds to 48 C.F.R. § 9904.xyz."  *Gates v. Raytheon Co.*, 584 F.3d 1062, 1064 n.2 (Fed. Cir. 2009).  The Board amended CAS 413 in 1995 and made two important changes.  First, the Board "specifically defined 'segment closing.'"  *Allegheny Teledyne Inc. v. United States*, 316 F.3d 1366, 1371 (Fed. Cir. 2003) (quoting CAS 413–30(a)(20) (1995)).  Second, the Board promulgated "a specific formula for allocating a pension surplus or deficit between the contractor and the government."  *Id.* (citing CAS 413.50(c)(12)).  Textron AD's case here deals only with the revised CAS 413 provisions.  *See* ECF No. 10 at 8–9 n.2 (describing pre- and post-1995 CAS revisions and noting that only "[r]evised CAS 413 is relevant to this case").

[7] *See also DIRECTV Grp., Inc. v. United States*, 670 F.3d 1370, 1372 (Fed. Cir. 2012) ("Like contributions made by the employer-contractor, the amount of the Government's contributions to the plan depends on actuarial assumptions regarding mortality rate, employee turnover, compensation levels, pension fund earnings, changes in values of pension fund assets, etc.").

the United States Court of Appeals for the Federal Circuit, explained the basic allocation process, as follows:

> The contractor first determines its pension cost as a whole, then allocates those costs among its different segments, then further allocates them among various contracts. Those pension costs allocated to cost-type government contracts are paid by the government if allowed under the [FAR] and the terms of the particular contract.

*Allegheny Teledyne*, 316 F.3d at 1371.

CAS 413, on the other hand, describes accounting standards for contractors to apply when they close a segment[8] of their business. *See* 48 C.F.R. § 9904.413. The normal rule is that "CAS 413 requires actuarial gains and losses to be amortized in equal annual installments over a 15-year period." *Raytheon Co.*, 747 F.3d at 1346. When a business segment closes, however — by virtue of discontinuing operations, being sold, or ceasing to perform government contracts[9] — this 15-year amortization period is not available. *See id.* ("When a business segment closes, however, there are no future periods within which to adjust the pension costs applicable to that segment."). Instead, when a business segment closes, CAS 413 provides that the contractor must "determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment." 48 C.F.R. § 9904.413-50(c)(12); *see also Raytheon Co.*, 747 F.3d at 1346 (describing this process). If there is a surplus, the government "may be entitled" to recover that surplus from the contractor; if there is a deficit, the contractor "may be entitled" to recover that deficit from the government. *Id.* at 1346–47. In either case, the requisite adjustment is known as a "segment closing adjustment." *Gates*, 584 F.3d at 1065. "In more simple terms, if the plan was overfunded at the time of the sale, the contractor owe[s] the Government its share of that overfunding; if it was underfunded, the Government ha[s] to contribute its share of the underfunding." Steven L. Briggerman, *Cost Accounting Standards: Liability for*

---

[8] The CAS defines "segment" as "one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service." 48 C.F.R. § 9904.13-30(a)(19); *see also* FAR 2.101 (same definition).

[9] *See* 48 C.F.R. § 9904.413-30(a)(20) ("Segment closing means that a segment has (i) been sold or ownership has been otherwise transferred, (ii) discontinued operations, or (iii) discontinued doing or actively seeking Government business under contracts subject to this Standard.").

*Interest Under CAS 413 When Terminating a Pension Plan*, 24 No.1 Nash & Cibinic Rep.
¶ 1 (Jan. 2010).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Claim Origins — Textron Inc.'s Acquisition of Beechcraft Entities

Textron AD's predecessor-in-interest was Hawker Beechcraft Defense Company,
LLC ("HBDC").  ECF No. 1 ("Compl.") ¶ 79.  HBDC's parent company was the Hawker
Beechcraft Corporation ("HBC").  Compl. at 2; Compl. ¶ 12.  In May 2012, HBC and its
related entities (collectively, "Beechcraft") began formal bankruptcy proceedings.
Compl. ¶ 15.

Through December 31, 2012, HBDC had been performing contracts with the
federal government (the "Contracts"), which incorporated FAR § 52.230-2 and were
CAS-covered.  Compl. ¶¶ 26, 79.  HBC contributed to three employee pension plans:
(1) the "Salaried Plan"; (2) the "Base Plan"; and (3) the "Hourly Plan."  Compl. ¶ 13.  As
part of the bankruptcy proceedings, on December 31, 2012, Beechcraft terminated the
Salaried Plan and the Base Plan, and curtailed the Hourly Plan.  Compl. ¶¶ 13, 16, 18,
23.  Also as part of the bankruptcy proceedings, Beechcraft transferred the assets and
liabilities of both the Salaried Plan and the Base Plan, along with $11 million in cash, to
the Pension Benefit Guaranty Corporation ("PBGC") on February 13, 2013.  Compl.
¶¶ 19–20.  Beechcraft's bankruptcy proceedings concluded on February 15, 2013.
Compl. ¶ 41.  In total, the PBGC received $441.7 million in liabilities and $422.1 million
in assets from the Salaried and Base Plans.  Compl. ¶ 20.

Beechcraft emerged from bankruptcy as a reorganized company, the highest-
level parent company of which was Beech Holdings, LLC.  Compl. ¶ 41.  On March 14,
2014, Textron Inc. acquired Beech Holdings, including the Contracts.  Compl. ¶ 43.
Through a series of corporate acquisitions, mergers, and new entity formations,[10]

---

[10] After the bankruptcy, Beech Holdings continued to perform the Contracts through
subsidiaries, including HBC and HBDC.  Compl. ¶ 41.  On March 1, 2013, HBDC changed its
name to Beechcraft Defense Company, LLC, and HBC changed its name to Beechcraft
Corporation.  Compl. ¶ 42.  On March 14, 2014, Textron Inc. acquired Beechcraft Holdings,
including the assets and liabilities of the Contracts.  Compl. ¶ 43.  On May 13, 2014, Textron Inc.
formed Textron Aviation Inc. ("TAI") as the corporate parent of Beech Holdings.  Compl. ¶ 44.
On January 1, 2017, Textron Inc. merged Beech Holdings into TAI; as a result, Beechcraft
Defense Company (formerly HBDC) became a wholly-owned subsidiary of TAI.  Compl. ¶ 45.
On April 5, 2017, Beechcraft Defense Company changed its name to Textron Aviation Defense
LLC (*i.e.*, "Textron AD," the plaintiff in this matter).  Textron AD is a wholly-owned subsidiary
of TAI.  Compl. ¶ 46.

Textron AD acquired the contractual rights and obligations arising from the termination of the Salaried Plan and Base Plan and the curtailment of the Hourly Plan.  Compl. ¶ 47.

### B.  Textron AD's CAS 413 Submission and CDA Claim

On April 4, 2018, Textron Inc. submitted a payment demand (what Textron AD has termed its "CAS 413 Submission") to the cognizant administrative contracting officer ("ACO") at the Defense Contract Management Agency, asserting that the government's share of the adjustment amount for all three pension plans was $18.9 million.  Compl. ¶¶ 48, 61, 63.  In other words, pursuant to CAS 413-50(c)(12), Textron Inc. calculated the government's share of the pension cost adjustment to be $18.9 million and requested that the government pay Textron Inc. that amount.  In February 2020, the Defense Contract Audit Agency audited that submission and determined that the government's share of the terminated plans should be approximately $19.4 million.  Compl. ¶¶ 64, 70.  As of April 6, 2020, however, the government had not paid any Textron entity any of the money Textron Inc. demanded and rejected the payment demand.  Compl. ¶ 69.

On April 6, 2020, Textron Aviation Inc. ("TAI") submitted a certified CDA claim (the "TAI Claim") for $19,407,515, alleging breach of contract based on the government's failure to pay TAI the requested pension cost adjustment.  Compl. ¶ 70.  The divisional ACO denied TAI's CDA claim on June 1, 2020, because, *inter alia*, the "test contract" described in the TAI Claim was a Textron AD contract, not a TAI contract.  Compl. ¶¶ 72, 73; ECF No. 9-1 at A1.[11]  To remedy that error, Textron AD resubmitted, on July 22, 2020, that same certified CDA claim to the cognizant contracting officer.  Compl. ¶ 74.  Indeed, Textron AD's certified CDA claim seeks payment of the same sum, $19,407,515, based on the same operative facts first alleged in the TAI Claim.  Compl. ¶¶ 5, 74–75.  The contracting officer denied Textron AD's CDA claim on September 8, 2020.  Compl. ¶¶ 7, 77; ECF No. 9-1 at A98–100 (concluding that the claim "is time barred by the Statute of Limitations at 41 [U.S.C. §] 7103").

### C.  Procedural History

On December 18, 2020, Textron AD filed its complaint against the United States in this Court, seeking the same sum claimed in — and effectively challenging the final decision denying — Textron AD's CDA claim.  Compl. at 1.  Textron AD alleges three

---

[11] *See* ECF No. 9-1 at A2 (Textron AD explaining that "[f]or purposes of this Claim, [Textron AD] has selected a representative or 'test' contract"); *see also Gates*, 584 F.3d at 1064 n.1 (explaining that the parties in that case "selected . . . an open, CAS-covered contract between [the contractor] and the Government, as a 'test' contract for purposes of establishing Board jurisdiction").

breaches of contract:  (1) a failure to pay the $6,541,645 government share of the adjustment amount under the Salaried Plan, Compl. ¶¶ 78–91 (Count One); (2) a failure to pay the $3,105,900 government share of the adjustment amount under the Base Plan, Compl. ¶¶ 92–105 (Count Two); and (3) a failure to pay the $9,759,970 government share of the adjustment amount under the Hourly Plan, Compl. ¶¶ 106–120 (Count Three).  In all, Textron AD seeks $19,407,515, as well as CDA interest.  Compl. at 22.[12]

On February 16, 2021, the government moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") for failure to state a claim, or, in the alternative, for summary judgment pursuant to RCFC 56.  ECF No. 9 ("Def. Mot.").  Specifically, the government argues that Textron AD submitted its July 22, 2020, certified CDA claim more than six years after that claim accrued and, thus, the claim is time-barred under the CDA's six-year statute of limitations.  *Id.* at 3.  The government contends that Textron AD's claim accrued, at the latest, on February 15, 2013, at which point "Beechcraft's bankruptcy was complete and the disposition of the relevant pension plans was set in stone."  *Id.* at 7.

On March 16, 2021, Textron AD filed its response and cross-motion for partial summary judgment.  ECF No. 10 ("Pl. Resp.").  The government filed a combined response and reply brief, ECF No. 11 ("Def. Resp."), and Textron AD filed a reply in support of its cross-motion, ECF No. 12 ("Pl. Reply").

On July 29, 2021, the Court held oral argument.  ECF Nos. 13, 16 ("Tr.").  At oral argument, counsel for Textron AD relied heavily on the Federal Circuit's decision in *Parsons Global Services, Inc. v. McHugh*, 677 F.3d 1166 (Fed. Cir. 2012).  *See, e.g.*, Tr. 50:23–53:4.  The Court subsequently ordered the parties to file supplemental briefs addressing *Parsons*.  *See* ECF No. 14 (supplemental briefing order); ECF No. 17 ("Pl. Supp. Brief"); ECF No. 18 ("Def. Supp. Brief").[13]

Finally, on February 24, 2022, the Court ordered the parties to submit additional supplemental briefing regarding how the rationale of *Gates v. Raytheon Co.*, 584 F.3d 1062 (Fed. Cir. 2009), should be applied to this case, if at all.  ECF No. 20.  The parties submitted their supplemental briefs on March 24, 2022.  ECF No. 21 ("Def. Second

---

[12] On February 2, 2021, the parties filed a joint motion to consolidate this case with *Textron Aviation Inc. v. United States*, No. 20-1883.  ECF No. 7.  On February 8, 2021, the Court held a status conference with the parties to discuss the motion to consolidate.  Minute Order (Feb. 3, 2021).  On February 9, 2021, the Court denied the motion without prejudice.  ECF No. 8.

[13] On October 6, 2021, Textron AD filed a notice of supplemental authority, addressing *Triple Canopy, Inc. v. Secretary of the Air Force*, 14 F.4th 1332 (Fed. Cir. 2021).  ECF No. 19.

Supp. Brief"); ECF No. 22 ("Pl. Second Supp. Brief"). The Court held a supplemental oral argument on March 31, 2022. ECF No. 28 ("Supp. Tr.").

### III.   JURISDICTION AND STANDARD OF REVIEW

The Tucker Act, as amended by the CDA, Pub. L. No. 95-563, 92 Stat. 2383 (1978), provides this Court "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 . . . on which a decision of the contracting officer has been issued under [the CDA]." 28 U.S.C. § 1491(a)(2). As a prerequisite to this Court's CDA jurisdiction, all claims by a contractor against the government relating to a CDA-covered contract must be in writing and submitted to the contracting officer for a decision. 41 U.S.C. § 7103(a). If the claim made by the contractor is for more than $100,000, the contractor must certify the claim. *Id.* § 7103(b)(1). The contractor's claim submission and the requirement that the contracting officer render a final decision on the claim are mandatory and are jurisdictional prerequisites for a contractor to file a CDA suit in this Court. *See M. Maropakis Carpentry, Inc. v. United States,* 609 F.3d 1323, 1327 (Fed. Cir. 2010) ("[J]urisdiction thus requires both a valid claim and a contracting officer's final decision on that claim."); *England v. Swanson Grp., Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004).

"[A] contractor has the option of appealing a contracting officer's decision on a CDA claim either to the appropriate board of contract appeals or [this Court]." *Guardian Angels Med. Serv. Dogs, Inc. v. United States*, 809 F.3d 1244, 1247 (Fed. Cir. 2016) (citing 41 U.S.C. § 7104). "Regardless of which forum a contractor elects, however, only final contracting officer decisions may be appealed." *Id.*

The CDA contains two statutes of limitations. The first governs the time period within which a contractor must submit claims to a contracting officer for a final decision, which, as noted above, is a prerequisite for a CDA action in this Court (or for an appeal to a board of contract appeals). *See* 41 U.S.C. § 7103(a)(4)(A). It requires contractors to submit such CDA claims within six years of the claim's accrual. *See id.* ("Each claim by a contractor against the Federal Government relating to a contract . . . shall be submitted within 6 years after the accrual of the claim.").

The second statute of limitations provision governs the time within which a contractor must challenge in this Court — or in an appeal to a board of contract appeals — a contracting officer's final decision on a contractor's CDA claim. *See* 41 U.S.C. § 7104. In particular, a contractor has one year to proceed to this Court from an adverse contracting officer's final decision, *see id.* § 7104(b)(3), or "90 days from the date of receipt of a contracting officer's decision" to appeal to a board, *id.* § 7104(a).

Although the latter limitations period (for challenging or appealing a contracting officer's final decision) may be jurisdictional,[14] the former is not.  *See Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315, 1320–22 (Fed. Cir. 2014); *Kellogg Brown & Root Servs., Inc. v. Murphy*, 823 F.3d 622, 630 (Fed. Cir. 2016) ("*KBR*") ("The court has confirmed that the limitations period of the Contract Disputes Act is not jurisdictional.").  Accordingly, in an action in this Court premised upon a CDA claim that was not submitted to the contracting officer within six years of the claim's accrual, the government may seek dismissal pursuant to RCFC 12(b)(6) for failure to state a claim or via a motion for summary judgment.  *See, e.g.*, *Al-Juthoor Contracting Co. v. United States*, 129 Fed. Cl. 599, 621 (2016) (dismissing, pursuant to RCFC 12(b)(6), several CDA claims submitted to a contracting officer more than six years after accrual); *Kansas City Power & Light Co. v. United States*, 143 Fed. Cl. 134, 137, 143 (2019) (granting government's motion for summary judgment for portion of plaintiff's CDA claim that plaintiff filed "more than six years after it accrued").

In evaluating a motion to dismiss for failure to state a claim, the Court accepts as true all *factual* allegations — but not conclusory legal assertions — contained in the complaint and views them in the light most favorable to the plaintiff.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1380 (Fed. Cir. 2019).  To survive a motion to dismiss, a complaint must allege facts that yield a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Pursuant to RCFC 56(a), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[14] *Compare Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1238 (Fed. Cir. 2002) ("As to jurisdiction, the CDA allows for two avenues of 'appeal' from the decision of a [contracting officer]: (1) appealing to the appropriate board of contracting appeals within 90 days; or (2) filing suit in the Court of Federal Claims within one year."), *Inter-Coastal Xpress, Inc. v. United States*, 296 F.3d 1357, 1365 (Fed. Cir. 2002) ("Although characterized as a statute of limitations, the filing period[ ] established by . . . the CDA [is] 'jurisdictional in nature,' for [it] operate[s] as [a] limit[ ] on the waiver of sovereign immunity by the Tucker Act, which otherwise entitles a contractor to sue the government in the Court of Federal Claims[.]") (citations and internal quotation marks omitted), *and Cosmic Constr. Co. v. United States*, 697 F.2d 1389, 1390 (Fed. Cir. 1982) ("The ninety day deadline is thus part of a statute waiving sovereign immunity, which must be strictly construed, . . . and which defines the jurisdiction of the tribunal, here the board." (citations omitted)), *with Guardian Angels Med. Serv. Dogs, Inc.*, 809 F.3d 1252 ("Nor need we decide whether compliance with the twelve-month filing period set out in section 7104(b)(3) is a jurisdictional requirement."), *and Bowman Constr. Co. v. United States*, 154 Fed. Cl. 127, 136 (2021) ("It is an open question whether the one-year statute of limitations in the CDA is jurisdictional.").

to judgment as a matter of law."  A "material fact" is one that could affect the outcome of the suit, and a genuine dispute is one that could permit a court to find in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving reasonable inferences against the party whose motion is under consideration."  *Silver State Land LLC v. United States*, 155 Fed. Cl. 209, 212 (2021) (quoting *First Commerce Corp. v. United States*, 335 F.3d 1373, 1379 (Fed. Cir. 2003)); *see also Lippmann v. United States*, 127 Fed. Cl. 238, 244 (2016) ("The [RCFC 56] standard also applies when the Court considers cross-motions for summary judgment.").

In this case, "the issue at the core of the dispute has been treated as purely legal" and "there has been no serious contention that the facts are contested."  *Easter v. United States*, 575 F.3d 1332, 1336 (Fed. Cir. 2009).  Because "this case involves essentially undisputed facts and turns on the legal consequences that attach to those facts . . . , nothing of significance turns on the distinction between a ruling on the pleadings and summary judgment."  *Id.*; *see also Richardson v. United States*, 157 Fed. Cl. 342, 353–54 (2021) (describing this standard).

## IV.    THE STATUTE OF LIMITATIONS PRECLUDES TEXTRON AD'S CDA CLAIM

As a general matter, the CDA is a jurisdictional minefield of the first order.  *See Volmar Constr., Inc. v. United States*, 32 Fed. Cl. 746, 761 (1995) ("Only Congress can address the fundamental problem that the CDA has become a jurisdictional maze — atypically hard on the Government in this case and usually a minefield for the contractor.  The real loser is the fisc.  Heavily litigated jurisdictional requirements just make the cost of contracting with the Government higher."); *United Partition Sys., Inc. v. United States*, 59 Fed. Cl. 627, 631 (2004) (noting "the complexity of the Contract Disputes Act's claim requirements, which are jurisdictional in this Court").

In this case, the issue is a narrow one:  whether Textron AD submitted a timely CDA claim to the cognizant contracting officer — *i.e.*, within six years of the claim's accrual.  While the universe of relevant CDA rules is thankfully limited, that does not necessarily mean they are easy to apply.  That is, however, the Court's mission in this case.  Here are the basic rules:

1. A proper CDA claim is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract."  FAR 2.101 (defining "claim").

2. A CDA claim accrues on "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known."  FAR 33.201; *see also Sikorsky Aircraft Corp.*, 773 F.3d at 1320 (quoting FAR 33.201).[15]

3. A CDA claim must be submitted to the contracting officer for a final decision within six years of the claim's accrual.  *See* 41 U.S.C. § 7103(a)(4)(A); FAR 33.206(a) ("Contractor claims shall be submitted, in writing, to the contracting officer for a decision within 6 years after accrual of a claim . . . .").

4. A "routine request" for a contract payment — a term of art discussed in detail below, *see infra* Section IV.B — is not a CDA claim, although such a request may be converted into a CDA claim if it is first disputed either as to liability or amount or is not acted upon in a reasonable time.[16]

5. The six-year "limitations period does not begin to run if a claim cannot be filed because mandatory pre-claim procedures have not been completed." *KBR*, 823 F.3d at 628; *see also Triple Canopy, Inc.*, 14 F.4th at 1339–40 (finding that "a 'mandatory pre-claim procedure' . . . had to be completed in order for [the contractor]'s claims to accrue and the CDA limitations period to begin to run").

Whether based on the non-conclusory factual allegations in Textron AD's complaint or this Court's review of the record, there simply is no dispute of material fact that Textron AD knew or should have known all of the information necessary to file

---

[15] "[B]y FAR definition, a 'claim' for 'the payment of money' does not 'accrue' until the amount of the claim, a 'sum certain,' FAR 2.101, is 'known or should have been known.'"  *KBR*, 823 F.3d at 627 (quoting FAR 33.201); *see also id.* at 628 ("Accrual in accordance with FAR § 33.201 does not occur until [the contractor] requests, or reasonably could have requested, a sum certain from the government."); *but see* FAR 33.201 ("For liability to be fixed, some injury must have occurred.  However, monetary damages need not have been incurred.").

[16] *See* FAR 2.101 ("A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim.  The submission may be converted to a claim, by written notice to the contracting officer as provided in 33.206(a), if it is disputed either as to liability or amount or is not acted upon in a reasonable time."); *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1576 (Fed. Cir. 1995) (en banc) (explaining that the FAR "specifically excludes only undisputed routine requests for payment from the category of written demands for payment that satisfy the definition of 'claim,'" and that necessarily "implies that all other written demands seeking payment as a matter of right are 'claims,' whether already in dispute or not").

a CDA claim at least as early as December 31, 2012,[17] and certainly no later than February 15, 2013.  *See* Supp. Tr. 24:5–14 (Textron AD conceding that it was "not impossible" for Textron AD's predecessor-in-interest to have calculated, as of December 31, 2012, the sums the government allegedly owes); Supp. Tr. 23:20–24 (Textron AD arguing only that performing the calculations as of December 31, 2012 "wasn't *practical*" (emphasis added)); Tr. 24:13–14 (Textron AD conceding that the predecessor-in-interest "could have done [the calculations] faster. You know, perhaps they could have if they absolutely focused on it."); Pl. Second Supp. Brief at 9 (contending only that submitting its CAS 413 Submission "in 2012" was "not practical[] . . . given the pension plans were terminated and curtailed on the last day of 2012 and the records . . . had to be analyzed by various experts").[18]

Textron AD did not submit its CDA claim to the contracting officer, however, until July 22, 2020, Compl. ¶ 74 — well after the six-year CDA claim submission limitations period had run.  Textron AD nevertheless contends that its CDA claim did not accrue in December 2012 or February 2013 for two reasons:  (1) Textron AD first had to comply with a mandatory pre-claim procedure, to include its so-called CAS 413 Submission, Pl. Resp. at 7–11; and (2) any request for payment on that date would have been a routine request for payment and, thus, by definition, could not qualify as a proper CDA claim (absent a pre-existing dispute), *id.* at 11–13.

The Court rejects both of Textron AD's arguments, and thus grants the government's pending motion to dismiss or, in the alternative, for summary judgment.

### A.  CAS 413 Does Not Contain a Mandatory Pre-claim Procedure

CAS 413 does not contain a mandatory pre-claim procedure that Textron AD was required to follow prior to submitting its CDA claim seeking the sum at issue in this case.  Textron AD contends that "when a segment is closed, a pension plan is

---

[17] *See* ECF No. 9-1 at A99 (contracting officer's final decision concluding that claim accrual "occurred no later than December 31, 2012").

[18] Textron AD's concessions during oral argument are binding.  *See Sergent's Mech. Sys., Inc. v. United States*, 157 Fed. Cl. 41, 54 (Fed. Cl. 2021) (collecting cases for the proposition that clear statements of counsel bind parties).  The government repeatedly argues that Textron AD's certified CDA claim accrued as early December 21, 2012, and as late as February 15, 2013.  Def. Mot. at 7; Def. Resp. at 5 n.2, 15; Def. Supp. Brief at 6, 8; Def. Second Supp. Brief at 3, 7.  The government provides supporting facts and logic for each date and Textron AD makes no real effort to refute those possible accrual dates, aside from its two primary legal arguments, which the Court addresses below.  The Court need not decide the precise date of accrual because, as noted, the Court concludes that the certified CDA claim at issue accrued no later than February 15, 2013.

terminated, or a pension plan is curtailed, CAS 413-50(c)(12) requires that a three-step process be followed." Pl. Resp. at 8. But that provision specifies nothing more than how "the contractor shall determine" (*i.e.*, calculate) either what the government owes the contractor or what the contractor owes the government. 48 C.F.R. § 9904.413-50(c)(12). Textron AD repeatedly refers to something it calls the "CAS 413 Submission"[19] — capitalized, as if that were some sort of defined term of art — but Textron AD identifies no language in CAS 413, or in any statute, regulation, or case law, to support the notion that there is some specific documentation that must be provided to the government for review prior to a contractor's submission of a CDA claim seeking CAS 413 pension costs.[20]

Textron AD further asserts that CAS 413 "involves the parties negotiating and reaching [an] agreement regarding the amount of the payment." Pl. Resp. at 10. But Textron AD cites no regulatory language or case to support that proposition, and for good reason: CAS 413 says no such thing. It neither expressly mandates nor implicitly contemplates negotiations as a prerequisite to a CDA claim. In an attempt to trigger negotiations, a contractor may always submit to the government an informal request for payment, in lieu of a CDA claim, for any amount the contractor calculates it is owed (including for a segment closing adjustment). Similarly, for example, both a request for an equitable adjustment ("REA") and a proper CDA claim may induce the government to enter into negotiations with a contractor. But, even if negotiations are anticipated or otherwise make good business sense for both parties, that does not mean that such negotiations are tantamount to a *mandatory* pre-claim procedure. Indeed, an REA specifically designed to trigger negotiations may itself qualify as a proper CDA claim; and, even if an REA is missing elements necessary to qualify as a proper CDA claim, that does not stop the statute of limitations from running.[21]

---

[19] *See* Compl. ¶¶ 4, 48–49, 51–64, 68–70, 74, 81, 83–84, 95, 97–98, 109–110, 112–113; Pl. Resp. at 2, 4, 6–7, 9–14; Pl. Reply at 1, 3–5, 9–15; Pl. Supp. Brief at 4–6.

[20] We continue to reference Textron AD's "CAS 413 Submission," but the Court's use of that term is not intended to imply that it is anything other than a non-routine payment demand that could have been submitted as a certified CDA claim as early as December 31, 2012, and certainly no later than February 15, 2013.

[21] *See Hejran Hejrat Co. Ltd v. United States Army Corps of Engineers*, 930 F.3d 1354, 1357 (Fed. Cir. 2019) (rejecting "[t]he government's argument that an REA cannot constitute a claim"). The Federal Circuit, in its recent decision in *Zafer Construction Co. v. United States*, explained some of the relevant factors for a contractor to consider in deciding whether to submit an REA or a CDA claim:

> Contractors must choose between submitting a claim—which starts
> the interest clock but requires the contracting officer to issue a final

Textron AD relies upon *KBR*, but neither that case nor its progeny support Textron AD's view. In *KBR*, the appellant contractor, Kellogg Brown & Root ("KBR"), demonstrated that the six-year statute of limitations had not run prior to KBR's submission of the CDA claim at issue. 823 F.3d at 623–24. In that case, KBR filed the relevant CDA claim with the contracting officer on May 2, 2012, and thus, "the critical date of accrual for limitations purposes [was] May 2, 2006." *Id.* KBR, however, demonstrated that, as of that critical date, KBR could not have calculated the required sum certain for its claim, a contention the government was unable to refute. *Id.* at 626–67. Moreover, "the Army *required* that KBR resolve disputed costs with [its] subcontractor before KBR could present a claim for reimbursement of those costs." *Id.* at 628 (emphasis added). That instruction, according to the Federal Circuit, constituted a mandatory pre-claim procedure. *See id.* ("As the Army repeatedly told KBR here, it would not consider any of KBR's submissions until after resolution of the subcontractor

decision within 60 days—and submitting a mere request for equitable adjustment—which does not start the interest clock but gives the contractor more time to negotiate a settlement and possibly avoid hefty legal fees. *See* Government Contract Compliance Handbook §§ 16:7, 16:11 (5th ed. Cumulative Supplement 2021–2022). The overlap between these two types of documents might create room for gamesmanship. For example, a contractor could submit a document that is a claim—starting the interest clock—but appears to be a mere request for equitable adjustment—causing the contracting officer to not issue a final decision within the 60-day deadline and allowing interest to accrue for months or years.

-- F.4th --, 2022 WL 2793596, at *5 (Fed. Cir. 2022) (holding that "[b]ecause Zafer's December 2014 request for equitable adjustment *implicitly* request[ed] a final decision[, it] therefore is a claim" (emphasis added)). Another related consideration is that the statute of limitations clock may run while an REA is pending, something commentators have consistently cautioned about. *See* Ralph C. Nash, *Slow Negotiation: A Dangerous Course of Action*, 34 Nash & Cibinic Rep. ¶ 41 (July 2020) (advising contractors against relying on the "argument that its claim did not accrue until it could calculate a sum certain" and suggesting instead that "[a] contractor (as a well as a Government agency) should assume that a claim starts to accrue when it learns that it is entitled to assert a claim" because "[a]t that point the clock is running" and "[i]t's up to the contractor to keep time"); Ralph C. Nash, *The Statute of Limitations: Requests for Equitable Adjustment Don't Count*, 35 Nash & Cibinic Rep. NL ¶ 17 (Mar. 2021) ("[A] contractor must be aware that the clock is running from an early date. It is a good idea to tab that date before beginning negotiations with the [contracting officer] and to keep it in mind if the negotiations are extended. Before you turn into a pumpkin, file a CDA claim.").

issues.").  Here, in contrast to the facts in *KBR*, the government did not provide Textron AD with any similar instruction— and Textron AD has not argued otherwise.

Textron AD does not even attempt to demonstrate that it was somehow precluded, by law or in fact, from calculating in December 2012 (or February 2013) the very same sums Textron AD ultimately demanded in its various submissions to the contracting officer.  Indeed, Textron AD conceded that such a calculation could have been performed as of December 31, 2012.  *See* Supp. Tr. 23:20–24 (Textron AD arguing only that such a calculation "wasn't practical"); Supp. Tr. 24:5-14 (Textron AD conceding that "it's arguable the contractor could have run the numbers" and that doing so was "not impossible"); Tr. 24:13–14 (Textron AD conceding that its predecessor-in-interest "could have done [the calculations] faster . . . if they absolutely focused on it").

The Federal Circuit's subsequent decision in *Electric Boat Corp. v. Secretary of Navy*, 958 F.3d 1372 (Fed. Cir. 2020), further supports this Court's conclusion that there is no mandatory pre-claim procedure applicable to Textron AD's CDA claim at issue here.  In *Electric Boat*, the Federal Circuit read *KBR* the way this Court does: the key fact in *KBR* was that "the Army required that the contractor resolve disputed costs with the subcontractor before filing a claim for reimbursement."  958 F.3d at 1376 (citing *KBR*, 823 F.3d at 628).  Again, in Textron AD's case here, the government imposed no such similar requirement.

The facts and reasoning of *Electric Boat* critically undermine Textron AD's hypothesis that a mandatory pre-claim process applied to its eventual CDA claim.  The contract at issue in *Electric Boat* at least "required" the contractor to "follow the standard equitable adjustment procedures" and "to 'promptly notify'" the government of a particular triggering event for increased compensation.  958 F.3d at 1376.  The Federal Circuit nevertheless concluded that the contractor "was not required to await a unilateral price adjustment prior to filing a claim."  *Id*.  Our appellate court thus held that the government's delay in "formally refus[ing] to adjust the price . . . does *not* excuse* Electric Boat's failure to timely file a claim in compliance with the CDA."  *Id*. at 1377 (emphasis added).  Unlike *Electric Boat*, Textron AD cannot even point to a similar requirement, let alone agency instructions, contract language, or regulatory provisions precluding Textron AD from submitting a timely CDA claim to the contracting officer for a final decision.

The Federal Circuit's recent decision in *Triple Canopy Inc. v. Secretary of the Air Force*, 14 F.4th 1332 (Fed. Cir. 2021), applied *KBR*'s mandatory pre-claim procedure rule but is easily distinguishable from Textron AD's case.  Indeed, if anything, *Triple Canopy* demonstrates that this Court should *not* apply *KBR* to save Textron AD's claim.  In

*Triple Canopy*, the Federal Circuit held that a provision of the Foreign Tax Clause, FAR 52.229-6, contained "a 'mandatory pre-claim procedure' that had to be completed in order for Triple Canopy's claims to accrue and the CDA limitations period to begin to run." 14 F.4th at 1339–40 (quoting *KBR*, 823 F.3d at 628). The Foreign Tax Clause, however, contained express mandatory language: "[t]he Contractor *shall* take all reasonable action to obtain exemption from . . . any taxes or duties . . . ." *Id.* at 1339 (quoting FAR 52.229-6(i)). The Federal Circuit thus "agree[d] with Triple Canopy that because it was seeking reimbursement of a [foreign tax] assessment pursuant to the Foreign Tax Clause, it had to comply with [FAR 52.229-6(i)]'s requirement that it 'take all reasonable action' to obtain 'exemption' from the assessment," which "meant appealing the assessment." *Id.* (quoting FAR 52.229-6(i)). In sum, our appellate court concluded that both "the structure *and language* of the Foreign Tax Clause defeats any suggestion that . . . pursuing an appeal of the . . . assessment before Triple Canopy submitted its claims to the [contracting officer] was optional." *Id.* at 1340 (emphasis added). In contrast, Textron AD does not identify, and this Court cannot find, anything in CAS 413's "structure and language" remotely suggesting the existence of a mandatory pre-claim procedure.

This Court thus agrees with the government that "Textron AD does not identify any language in CAS 413 that required it to wait to submit its certified claim." Def. Resp. at 6. And, critically, Textron AD "does not argue that it lacked any information or was otherwise unable to perform its calculations on February 15, 2013, or on any date thereafter." *Id.* at 9. Plaintiff's reply brief does not respond with any specificity to the first assertion and does not respond at all to the latter.

Finally, this Court's conclusion that CAS 413 does not contain a mandatory pre-claim procedure is buttressed further by the Federal Circuit's decision in *Gates v. Raytheon Co.*, 584 F.3d 1062 (Fed. Cir. 2009). In *Gates*, the Federal Circuit held that the contractor violated CAS 413-50(c)(12) because it "did not make the required segment closing adjustments until 2004" when they instead should have been made in 1998 and 2000. *Id.* at 1067–68 (concluding "that CAS 413 requires a current period adjustment (i.e., payment in the current period), rather than simply dictating the appropriate accounting treatment").[22]

---

[22] *See also Gates*, 584 F.3d at 1068–69 ("Because CAS 413–50(c)(12) contemplates adjustment to any or all contracts that are open during the period of the segment closing, it is on these open contracts that the Government has paid increased costs. That is, during 1998 (for [one business segment]) and 2000 (for [another segment]), CAS 413–50(c)(12) required that Raytheon adjust the prices of its open contracts. Raytheon did not do so. Thus, the Government overpaid on those contracts open during 1998 and 2000, and that overpayment was a result of Raytheon's

We learn at least two things from *Gates*.  First, the Federal Circuit reads CAS 413 as requiring that any adjustment attributable to a segment closing be calculated and applied during the period of that closing.  The clear and necessary implication is that a contractor cannot delay its calculation and adjustment as Textron AD did here.[23]  *Cf. Gen. Elec. Co. v. United States*, 60 Fed. Cl. 782, 796 (2004) ("The time to settle-up with the government for any surplus or deficit attributable to government contributions relating to the closed units is at the time of the segment closing.").  Second, there is not even a hint in *Gates* that CAS 413 specifies some sort of mandatory pre-claim procedure that a contractor must follow, in conjunction with the government, to effectuate an adjustment.[24]  In sum, *Gates* cannot be squared with Textron AD's hypothesis that CAS 413 contains a mandatory pre-claim procedure.  *See* Def. Resp. at 10 ("Textron AD's own inaction cannot suffice to extend [its claim] accrual date.").

### B.  Textron AD's Demand for Payment Was Not Routine and Could Have Been Submitted as a Proper CDA Claim in December 2012 or February 2013

Textron AD contends that it could not have submitted a proper CDA claim in December 2012 or February 2013 — and thus its CDA claim did not begin to accrue — because any payment demand would have been nothing more than a routine request for payment, akin to an undisputed invoice or voucher.  Pl. Resp. at 11–13; *cf. Parsons*, 677 F.3d at 1172 ("What [a contractor] cannot do is classify its request as non-routine so it can submit it directly to the [contracting officer] as a claim without pursuing the proper avenues under the prime contract.").  Instead, Textron AD posits that it could not have submitted a proper CDA claim until the government first disputed its so-called "CAS 413 Submission on February 26, 2020 . . . or, more likely, [until] some reasonable time later when the government failed to act upon the CAS 413 Submission in a reasonable period of time."  Pl. Resp. at 13 (arguing that "[i]t was not until this time

---

failure to properly credit the segment closing adjustment in those periods as required by CAS 413–50(c)(12).").

[23] *See* Steven L. Briggerman, *Cost Accounting Standards: Liability for Interest Under CAS 413 When Terminating a Pension Plan*, 24 No.1 Nash & Cibinic Rep. ¶ 1 (Jan. 2010) (summarizing *Gates* and concluding that "[o]n the noncompliance issue, the court — as had the board in its initial decision — equated the language in [CAS] 413-50(c)(12)(vii) with a requirement that actual payment be made within the same time period of the segment's closing").

[24] Now, granted, Textron AD may respond that the adjustment at issue in *Gates*, 584 F.3d at 1063, was a payment or credit owed *to the government* and thus *Gates* does not teach anything about a situation where, as here, the government allegedly owes money to the contractor.  *See, e.g.*, Pl. Second Supp. Brief at 1–2.  Textron AD, however, points to no language in CAS 413 — or any interpretive case law — that even remotely suggests the existence of different procedures depending upon which party may owe, or claims it is owed, money.

that [Textron AD] was permitted, pursuant to the definition of claim in FAR § 2.101, *to convert* the CAS 413 Submission into a 'claim'" (emphasis added)).

The Court rejects Textron AD's argument for two primary reasons.  First, as demonstrated above, Textron AD's underlying premise that there is such a thing as a routine request for payment known as a "CAS 413 Submission" is Textron AD's own, albeit creative, fiction.  There is simply no such required submission defined in any statute, regulation, or contract provision, either expressly or implicitly.  Second, Textron AD's CAS 413 Submission is, in any case, a non-routine demand for payment — it is not remotely like an invoice — and thus could have been submitted long ago to the contracting officer in the form of a proper CDA claim.  Indeed, the FAR defines an "invoice" as "a contractor's bill or written request for payment under the contract *for supplies delivered or services performed*."  FAR 2.101 (emphasis added).  Accordingly, Textron AD's failure to submit a timely CDA claim is fatal to its complaint.

Because the distinction between routine and non-routine requests for payment is a sticky wicket of epic proportions in Federal Circuit jurisprudence, we start at the very beginning — with *Reflectone, Inc. v. Dalton*, an *en banc* Federal Circuit decision that held a contractor's REA constituted "a CDA 'claim.'"  60 F.3d at 1573.  *Reflectone* reached that conclusion based on the FAR's definition of "claim," now located (as noted *supra*) at FAR 2.101.  In *Reflectone*, the Federal Circuit explained how the fact that the FAR

> specifically excludes only undisputed *routine* requests for payment from the category of written demands for payment that satisfy the definition of "claim" implies that all other written demands seeking payment as a matter of right are "claims," whether already in dispute or not.  The inclusion of only one exception to the definition of "claim" — undisputed, routine requests — implies the exclusion of any others.

*Reflectone*, 60 F.3d at 1576.  According to *Reflectone*, any broad requirement for a pre-existing dispute would make little sense: "it is illogical to require a dispute before a demand for payment rightfully due can be a 'claim' because to have a dispute the contractor first must make a demand as a matter of right, i.e., a claim, that is then refused."  *Id.*

What is crystal clear from *Reflectone* is that the *form* of the payment demand may, in fact, be critical; as the Federal Circuit explained, "neither the CDA, its legislative history, nor the FAR, nor its history, suggests that a dispute must pre-date the contractor's submission of the claim to the CO when the claim is *in the form* of a non-routine demand as of right."  *Reflectone*, 60 F.3d at 1576 (emphasis added).

18

The Federal Circuit even explained why the *form* of the payment demand — and the distinction between routine and non-routine requests for payment — is so critical:

> The distinction excluding routine requests for payment from the definition of "claim" relieves COs from the requirement of issuing a CDA final decision on each and every voucher that the government is obligated to pay under the express terms of the contract during its ordinary progression, including "progress payments." The process for converting such routine requests, if disputed, into claims assures that only those submissions that need final decisions will require them.

*Id.* at 1576 n.6. The operative FAR provision and the Federal Circuit were obviously concerned with straightforward, practical problems: a contracting officer cannot be expected to issue a final decision on each and every ordinary invoice — and, relatedly, contractors should not be able to run to court simply because their routine payment requests are unduly delayed or expressly denied. Permitting contractors to engage judicial machinery based upon the government's rejection of routine payment requests would defeat the point of the CDA's administrative claim submission process: to enable the parties to settle disputes without the need for judicial involvement.

The Federal Circuit concluded, however, that "an REA is anything but a 'routine request for payment'" because "[i]t is a remedy payable only when *unforeseen or unintended circumstances* . . . cause an increase in contract performance costs." 60 F.3d at 1577 (emphasis added) (holding that "[a] demand for compensation for unforeseen or unintended circumstances cannot be characterized as 'routine'"). Notably, the Federal Circuit made clear that not "every non-routine submission constitutes a 'claim' under the FAR" — *i.e.*, "submissions which do not seek payment as a matter of right are not claims." *Id.* at 1577 n.7. But the central reason why an invoice or voucher *is* a routine request for payment is that they are "submitted for work done or equipment delivered by the contractor in accordance with the expected or scheduled *progression of contract performance*." *Id.* at 1577 (emphasis added). In contrast, "[a]n REA can hardly be compared to an invoice, voucher or progress payment [request]." *Id.*

Applying *Reflectone*'s instructions and rationale, this Court concludes that Textron AD's position — that its CAS 413 Submission was "routine" even though it demanded a sum arising from an unanticipated bankruptcy — is wrong. If anything, the so-called CAS 413 Submission was a classic *non*-routine *demand* for payment which could have been submitted as a proper CDA claim as early as December 31, 2012, or by February 15, 2013, at the latest. The CAS 413 Submission itself claimed that "Textron is

entitled to recover from the government a total of $18.9M pursuant to CAS § 413-50(c)(12)."  ECF No. 9-1 at A37.  Accordingly, at a minimum, the submission is non-routine for the simple reason that the alleged amount owed to Textron AD has no connection whatsoever to the "expected or scheduled progression of contract performance," *Reflectone*, 60 F.3d at 1577, but rather arises from an unanticipated bankruptcy and associated segment closings, *cf. James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1542–43 (Fed. Cir. 1996) ("A request for payment submitted after the government has terminated the contract . . . is a far cry from a request submitted in accordance with the expected or scheduled progression of contract performance"). Except in the most general sense that CAS covers the eventuality of segment closings, as discussed *infra*,  segment closings have nothing to do with contract performance and are not anticipated by the parties.  Textron AD's CAS 413 Submission does not purport to have anything to do with the performance of any specific contract.  ECF No. 9-1 at A25 ("This letter represents [Textron AD's] submission under [CAS] § 413-50(c)(12)."); *id.* at A35 ("the government's obligation exists pursuant to CAS § 413-50(c)(12)").

Nor is the form of Textron AD's CAS 413 Submission at all similar to the routine payment requests that the FAR and *Reflectone* identify, such as a "voucher [or] invoice," FAR 2.101, "that the government is obligated to pay under the express terms of the contract during its ordinary progression," *Reflectone*, 60 F.3d at 1576 n.6.  Indeed, Textron AD's so-called CAS 413 Submission "request[ed] government payment [directly] to Textron" in lieu of "[c]ontract adjustments," which Textron AD itself asserted were "not appropriate because the former Beechcraft business no longer exists."  ECF No. 9-1 at A37.  Given Textron AD's own admission that "[c]ontract adjustments" were "not appropriate" in this case, *id.*, that strikes the Court as a reliable sign that the payment demand at issue was not similar to a voucher or invoice, both of which seek sums payable during a contract's "ordinary progression," *Reflectone*, 60 F.3d at 1576 n.6.  And the degree to which a request for payment is similar to a "voucher or invoice" must be this Court's touchstone, as the remaining part of the FAR's definition — referencing "other routine request[s] for payment," FAR 2.101 — must be interpreted consistent with the *noscitur a sociis* canon of construction.[25]

A short thought experiment further demonstrates Textron AD's error.  All the Court has to do is consider the counterfactual: what if Textron AD had submitted its

---

[25] "[W]e rely on the principle of *noscitur a sociis* — a word is known by the company it keeps — to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words . . . .'"  *Yates v. United States*, 574 U.S. 528, 543 (2015) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)); *see also United States v. Williams*, 553 U.S. 285, 295 (2008) ("[T]he commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated.").

July 22, 2002, certified CDA claim years ago, in December 2012 or February 2013, and then timely proceeded to this Court following the contracting officer's denial of the claim?  If that had occurred and the government had moved to dismiss a subsequent CDA action in this Court for lack of jurisdiction — on the grounds that the submission to the contracting officer was nothing more than a routine request for payment (like an invoice) masquerading as a CDA claim — what would the Federal Circuit's jurisprudence dictate?  Would the Federal Circuit have held that such a demand for payment is a proper CDA claim or an improper, routine request for payment that did not require a contracting officer's final decision (even if one had been rendered)?  This Court thinks the answer may be readily deduced from *Reflectone*'s view of REAs — as well as the Federal Circuit's recent decision in *Zafer Construction Co. v. United States*, 2022 WL 2793596, at *1 (holding that an REA constituted a proper CDA claim even though the REA did not expressly request a contracting officer's final decision and even though the contractor later converted the REA to a claim at the government's request).

Characterizing Textron AD's CAS 413 Submission as a routine payment request, such that Textron AD could not have submitted it as a proper CDA claim years earlier, would promote precisely the type of mechanical inefficiency the Federal Circuit cautioned against in *Reflectone*: "The parties are not prevented or discouraged from settling their differences because the first written demand for payment as a matter of right that is not merely a routine request for payment is recognized and treated as a CDA 'claim.'  *If anything, such a rule promotes settlement by preventing procrastination*."  60 F.3d at 1583 (emphasis added).  This Court has no doubt that it would have treated Textron AD's CDA claim as a proper submission had it been transmitted to the contracting officer in a timely fashion (*i.e.*, within six years of February 15, 2013, at the latest).  The other side of that coin is that this Court must reject Textron AD's argument that it could not have submitted a claim until April 4, 2018, or February 26, 2020, as Textron AD variously argues.  *See* Pl. Resp. at 7, 13.  Endorsing Textron AD's position would do anything but "promote[] settlement by preventing procrastination."  *Reflectone*, 60 F.3d at 1583.[26]

The Federal Circuit's decision in *James M. Ellett Construction Co. v. United States* further supports this Court's conclusion that Textron AD's CAS 413 Submission constituted a non-routine demand for payment (and, thus, that Textron AD's CDA claim was untimely).  In that case, the Federal Circuit rejected the government's preferred definition of "routine" — "[i]n accordance with established procedure" — in favor of defining it as "'habitual; regular,' and '[n]ot special; ordinary,'" as well as "of a

---

[26] There is no suggestion that contracting officers need to be "relieve[d]" from the burden of issuing final decisions addressing the unusual situation of segment closing adjustments, lest they be overwhelmed with unnecessary work.  *Reflectone*, 60 F.3d at 1576 n.6.

commonplace or repetitious character." *Ellett*, 93 F.3d at 1543 (first quoting American Heritage Dictionary 1074 (2d ed. 1982), then quoting Webster's New Collegiate Dictionary 1001 (150th anniversary ed. 1981)). The Federal Circuit concluded that "[o]nce the government terminates for convenience, the procedures used to determine a contractor's recovery could be perceived as routine, in the sense that the same ones are followed each time" but "*that does not make them routine in the overall scheme of the contract and the parties' expectations*." *Id.* (emphasis added).

In this case, the contractor (here, Textron AD) and the government have essentially swapped their respective positions from *Ellett*, with the contractor in this case now arguing that its payment request would have been routine because it was "made under the contract." Pl. Resp. at 12. The government staked out a similar position in *Ellett* but the Federal Circuit rejected it, explaining that "[t]he government's interpretation falls of its own weight, however, because in *Reflectone* itself, the claim was submitted pursuant to the Changes clause of the contract for additional costs incurred in part from government-caused delays" and yet the request for payment was held to be non-routine. 93 F.3d at 1543.

Accordingly, the critical question is *not* whether a payment request can be tied in some manner to a contract provision — or that it is submitted "under the contract" — but rather whether the payment request "seek[s] compensation because of unforeseen or unintended circumstances, in contrast to routine submissions, which are made 'under the contract' *because they are made 'in accordance with the expected or scheduled progression of contract performance.*'" *Ellett*, 93 F.3d at 1543 (emphasis added) (quoting *Reflectone*, 60 F.3d at 1577). *Ellett* thus makes clear that when the Federal Circuit used the phrase "under the contract" in *Reflectone,* our appellate court did not create a rule that any request for payment that invokes a contract clause or provision is, *per se*, routine. Textron AD's position here was soundly rejected when the government advanced it in *Ellett*, and this Court rejects it as well.[27]

Further undermining any notion that the payment demand at issue is routine is the fact that Textron AD's CDA claim is based, in part, upon an interpretation of an

---

[27] Notably, the Federal Circuit in *Zafer* distinguished *Ellett* on the grounds that "[u]nlike the [contractor] in *Ellett*, Zafer was not contractually required to propose and attempt to negotiate a settlement with the government before submitting a claim, so the reasoning of *Ellett* does not apply here." *Zafer*, 2022 WL 2793596, at *4. In *Ellett*, the Federal Circuit held that "while [the contractor]'s termination settlement proposal met the FAR's definition of a claim, at the time of submission it was not a [proper] claim because it was not submitted to the contracting officer for a decision." 93 F.3d at 1544. As was the case for the contractor in *Zafer*, Textron AD points to no contractual obligation for either the government or Textron AD to negotiate with each other to settle pension cost amounts "before submitting a claim." *Zafer*, 2022 WL 2793596, at *4 .

agreement with PBGC necessitated by the bankruptcy proceedings.  ECF No. 9-1 at A14–15 (asserting that "the terms of the PBGC Agreement establish the arrangement between the parties regarding the treatment of the pension plans"); A17 (arguing that the government "ignores the wording of the PBGC Agreement and the economic substance of [Textron AD's] agreement with PBGC regarding the terminated plans").  The fact that Textron AD's various payment demands require the government to refer to, and interpret, a separate agreement with the PBGC further emphasizes the distinction between, on the one hand, such non-routine payment demands and, on the other hand, a routine contract payment request like an invoice that the FAR excludes from the definition of the term "claim."[28]

Finally, nothing in *Parsons Global Services, Inc. v. McHugh,* 677 F.3d 1166 (Fed. Cir. 2012), is inconsistent with this Court's conclusion or otherwise requires this Court to side with Textron AD.

The Federal Circuit in *Parsons* explained that "[t]he distinction between a routine and non-routine request for payment is a factual one, dependent on the circumstances in which the requested costs arose."  677 F.3d at 1170.  Just as in *Reflectone* and *Ellett,* the Federal Circuit in *Parsons* reaffirmed that, in general, "[a] routine request is one incurred and submitted 'in accordance with the expected or scheduled progression of contract performance.'"  *Id.* (quoting *Ellett,* 93 F.3d at 1542–43).

As Textron AD notes, Pl. Supp. Brief at 3, *Parsons* provided several examples of non-routine requests for payment and commented that "[a] common thread among these examples is the presence of some unexpected or unforeseen action on the government's part that ties it to the demanded costs," 677 F.3d at 1170–71.  Observing a common thread among a few examples, however, is a far cry from conclusively defining a term.  Indeed, the same page of the opinion clarifies that government action is merely one type of unanticipated activity that can give rise to a non-routine payment request.  *Id.* at 1171 ("The payment Parsons now seeks . . . is not a result of intervening unforeseen circumstances ***or*** government action." (emphasis added)).  Government action is thus not the *sine qua non* of a non-routine payment request; rather, "unforeseen circumstances" alone may suffice.  *Id.*  Moreover, *Parsons* did not purport to provide an exhaustive list of examples of the term "non-routine," nor did that case address CAS 413 pension cost issues.

In *Parsons,* the Federal Circuit concluded that the contractor's request for payment at issue was routine because "[t]he costs originate from scheduled contract

---

[28] Textron's CAS 413 Submission is similarly replete with references to the PBGC Agreement.  *See, e.g.,* ECF  No. 9-1 at A26–28, A30, A38.

work," "[n]one of the work was additional or unforeseen work at the government's behest," and "[t]he prime contract explicitly covers these costs." 677 F.3d at 1171.  In other words, "[b]ecause Parsons's request should be submitted under the prime contract *and in accordance with the expected progression of contract performance*, it is routine." *Id.* (emphasis added).  In so holding, *Parsons*, like *Ellett*, specifically relied on the Federal Circuit's decision in *Reflectone* for the proposition that routine requests are those "submitted for work done or equipment delivered by the contractor in accordance with the expected or scheduled progress of contract performance." *Parsons*, 677 F.3d at 1171–72 (quoting *Reflectone*, 60 F.3d at 1577).  Applying that rationale to the facts in this case, this Court cannot conclude that the pension costs at issue here are "for work done . . . by the contractor" or otherwise "in accordance with the expected or scheduled progress of contract performance." *Id.*  Again, the disputed pension costs have nothing to do with the work covered by the contracts upon which Textron AD relies to assert its claim for the recovery of pension costs.[29]

* * * *

A final comment is warranted here.  "It has been said that the life of the law is experience." *Johnson v. United States*, 576 U.S. 591, 601 (2015) (paraphrasing Oliver Wendell Holmes, The Common Law 1 (1881)).  Recent experience unfortunately suggests that "in the CDA realm, . . . jurisdictional instability may be enjoying a resurgence." Steven L. Schooner, *Postscript: Contract Disputes Act "Claims": Is "Additional Or Unforeseen Work At The Government's Behest" A Prerequisite?*, 26 No. 8 Nash & Cibinic Rep. ¶ 40 (Aug. 2012).  Or perhaps it never really abated.[30]

---

[29] *Parsons* similarly concluded that "nothing in this opinion alters our previous holding that the presence of contract clauses that set forth procedures for requesting costs in unforeseen circumstances . . . alters the nature of an otherwise non-routine request." 677 F.3d at 1172 n.6 (citing *Ellett*, 93 F.3d at 1542–43).

[30] *See* Ralph C. Nash & John Cibinic, *The Contract Disputes Act: Can It Be Improved?*, 1 No. 12 Nash & Cibinic Rep. ¶ 88 (Dec. 1987) (concluding that "there is far too much jurisdictional and procedural litigation under the CDA" and that CDA jurisprudence makes it seem like "the goal of the Act is to litigate esoteric legal issues rather than to end serious controversies"); *Zafer Constr. Co. v. United States*, 151 Fed. Cl. 735, 741–42 (2020) (holding that a contractor's "claim did not comply with the requirements of the CDA" because "[w]hat was missing . . . was any indication that [the contractor] was expecting a final decision" and that "the wording and the parties' subsequent conduct is inconsistent with treating the REA as a final demand for a decision and payment"), *rev'd and remanded*, -- F.4th --, 2022 WL 2793596 (Fed. Cir. 2022) (holding that the contractor's REA "implicitly requests a final decision and therefore is a claim").

In any event, the Court cannot help but note, once again, that the parties' respective positions in this case are the opposite of what we might ordinarily expect. Typically, as in *Zafer*, a contractor is trying to have its case heard by this Court (or a board of contract appeals) and the government argues that the underlying payment demand is *not* a proper CDA claim and, thus, the Court (or board) lacks jurisdiction. In this case, the issue is whether the statute of limitations has run and so naturally there is somewhat of a role reversal: the contractor is arguing that had it submitted its CDA claim when the government says it should have, the claim would not have been proper. The fact that this case turns on the FAR's definition of a "claim" — a term that is not even defined in the CDA itself — and gives rise to the jurisprudential equivalent of situational ethics, jurisdictional confusion and, thus, extensive litigation, is indeed unfortunate and imposes unnecessary costs on the procurement system and, in turn, the public fisc. *See Volmar Constr.*, 32 Fed. Cl. at 761. And it is even more unfortunate when the result of the jurisdictional complexity is that a contractor loses out on a payment (or at least part of a payment) that the government otherwise appears to owe (or perhaps even admits to owing). *See Parsons*, 677 F.3d at 1174 (Newman, J., dissenting) ("This lengthy [CDA] litigation of a conceded governmental obligation is an embarrassment.").

This Court, however, is bound to apply the statute of limitations as written, without regard to whether the government may have actually owed the pension costs at issue (or some portion of those costs). In that regard, this Court of course must follow the Federal Circuit's instruction that "we evaluate whether a particular request for payment amounts to a claim based on the FAR implementing the CDA, the language of the contract in dispute, and the facts of each case," *Parsons*, 677 F.3d at 1170. Such an ad hoc analysis is always challenging, but even more so where, as here, the ultimate CDA claim appears to be a proper one, the government contends that it could have been submitted long ago, but the contractor contends that an earlier "claim" would have been nothing more than a mere routine request for payment. The circumstances of this case suggest, however, that focusing on whether or not a particular payment demand is like an invoice — the rejection of which does *not* permit a contractor to run to court — would perhaps nudge the "routine" versus "non-routine" analysis closer to a bright line rule that, in the long run, would save parties time and money. In this case, Textron AD's so-called CAS 413 Submission bears no resemblance to an "invoice" as that term is separately and expressly defined in the FAR, *see* FAR 2.101, and the sum Textron AD seeks is not for contract work (expected or otherwise). Textron AD's payment demand could have been submitted to the cognizant contracting officer as a CDA claim in February 2013 at the latest.

## V.      CONCLUSION

The facts of this case make clear that Textron AD could have submitted its CAS 413 Submission as a certified CDA claim as early as December 31, 2012, or February 15, 2013.  Thus, the CDA's six-year statute of limitations ran by the time Textron AD submitted its certified CDA Claim to the contracting officer, on July 22, 2020.  Textron AD's complaint based upon that certified CDA Claim, therefore, is time-barred.  None of Textron AD's arguments persuade the Court otherwise.

Accordingly, the Court **GRANTS** the government's motion to dismiss Textron AD's complaint pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief may be granted and, in the alternative, for summary judgment pursuant to RCFC 56. The Court **DENIES** Textron AD's cross-motion for partial summary judgment pursuant to RCFC 56.

The Clerk is directed to enter **JUDGMENT** for Defendant, the United States.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
Matthew H. Solomson
Judge